**In re Sophie SERRATO, Debtor.**

**Suzanne L. DECKER, Plaintiff,**

**v.**

**Frank J. VOISENAT, Defendant.**

**Bankruptcy No. 590–04408.**
**Adv. No. 92–5396.**

United States Bankruptcy Court, N.D. California.

Sept. 30, 1997.

Mark S. Bostick, Wendel, Rosen, Black & Dean, Oakland, CA, for plaintiff Suzanne L. Decker, trustee.

Mark Voisenat and Phyllis N. Rafter, Law Office of Phyllis N. Rafter, Oakland, CA, for defendant Frank J. Voisenat.

## OPINION

MARILYN MORGAN, Bankruptcy Judge.

### I. INTRODUCTION

This adversary proceeding is one of several fraudulent transfer actions filed by the trustee arising in the chapter 7 case of Sophie Serrato. What sets this proceeding apart from the typical fraudulent transfer action is the sophistication of the participants and their familiarity with the bankruptcy process.

Serrato is, in her own words, a "real estate consultant" in the business of "mitigation of foreclosures." At the time of trial in this matter, she operated a business known as Home Equity Line Plan (HELP) that provided consulting services to financially distressed clients attempting to preserve their homes against foreclosure sales. Serrato gave seminars on this topic. Serrato also has a law degree, but is not licensed by the State of California. In 1992, she was adjudicated a vexatious litigant pursuant to California Code of Civil Procedure section 391, a finding later affirmed by the California Sixth District Court of Appeals.

Serrato has three adult children: Frank, Marc and Phyllis. Frank is the defendant in this adversary proceeding. Marc is an attorney with a bankruptcy practice, a licensed real estate broker and President of MVP Realty. Phyllis is also an attorney practicing bankruptcy law. Marc and Phyllis represented Frank as counsel in this adversary proceeding.

The trustee alleges that Serrato quitclaimed property she owned at 1918 102nd Avenue in Oakland, California to Frank in September of 1988 in an attempt to defraud her creditors. The trustee asserts that this transfer was one of a series of fraudulent transfers Serrato made during that time period, and that it exemplifies Serrato's decade-long practice of transferring assets to family members and friends to hide them from her creditors and from the trustees during her numerous bankruptcy cases.

### II. FACTUAL BACKGROUND

#### A. The Small Business Administration Loan.

In May 1980, Serrato obtained a $50,000 loan from the Small Business Administration (SBA) to fund a business called Attorney Services Legal Clinic (ASLC). ASLC provided low cost services to clients in need of legal advice. Serrato's role at ASLC was to meet with potential clients, determine the legal issues they presented, and refer them to staff attorneys with particular legal expertise.

Serrato's SBA loan was secured by a lien on all of ASLC's business equipment, including machinery, furniture and fixtures, and Serrato's personal property. The SBA loan was also secured by Serrato's personal guarantee. As part of the guarantee, Serrato assigned to the SBA her interest in a $30,000 promissory note made by Guy West and C. Allen West. The West note was secured by property at 2917 Moran Road in Arnold, California which Serrato claimed was worth approximately $100,000 in 1980. She did not assign the deed of trust that she held on the property to the SBA.

Serrato made only one payment on the SBA loan. On October 14, 1980, the loan went into collection status. On August 10, 1982, the Superior Court for Alameda County entered a final judgment and permanent injunction prohibiting Serrato from operating ASLC. As part of the judgment, Serrato stipulated to having unlawfully practiced law in California. Because she could no longer operate ASLC, the SBA did not advance any additional funds to Serrato. At that point, the SBA had funded $16,900 of the loan. Serrato testified that she felt she no longer owed the SBA any money on its loan since she had assigned the West note as collateral and had given the SBA a lien on her business and personal property, collateral she claimed was worth in excess of $90,000, in return for only $16,900.

## B. Serrato's Practice of Transferring Property To Family Members.

On April 28, 1983, Serrato assigned the West note and deed of trust to her sister, Mercy Lopez. She did not inform the SBA of this assignment. Although Serrato did not produce the actual assignment document, she testified that she made the assignment subject to the SBA's lien. Serrato claimed she made the assignment to Lopez because Lopez had given Serrato $16,000 at a financially difficult point in Serrato's life. The $16,000 gift purportedly came with no strings attached. However, Serrato decided that she wanted to put the West note in her sister's name, in case the SBA ever "gave me back my note" and Serrato "died or whatever happened." She put the West note and deed of trust in Lopez's name, but did not tell Lopez about this assignment.

Two months later, on July 27, 1983, Serrato filed a chapter 11 case in Oakland, California. On September 2, 1983, Serrato record-

ed her assignment of the West note and deed of trust to Lopez. Serrato's chapter 11 case was dismissed by court order entered on December 5, 1983. On March 8, 1984, Serrato filed a chapter 13 case in Oakland, California. This case was dismissed by court order entered on November 15, 1984.

On April 11, 1985, Serrato filed a second chapter 13 case in Oakland, California. On May 14, 1985, Serrato sent the SBA an "Offer in Compromise" proposing to pay $21,000 to settle her debt.[1] She claimed the SBA sent the form to her, asked her to fill it out, and agreed that it would compromise its debt if she filled out the form. She felt this was the only way the SBA would negotiate with her. At trial, Serrato explained that although she believed she owed nothing to the SBA since its debt was oversecured, she sent the offer to "get rid of" the SBA and to get rid of the "ax over [her] head." However, the SBA did not respond to Serrato's offer. The chapter 13 case was voluntarily dismissed by court order entered on July 24, 1985. On July 14, 1986, Lopez reconveyed the West note and deed of trust to Serrato.

In early 1988, Serrato and her husband, Mark Davenport, were in the process of obtaining a marital annulment. On March 18, 1988, Davenport filed a chapter 7 case in the San Francisco Bankruptcy Court. Soon thereafter, Serrato and the chapter 7 trustee were embroiled in a series of disputes regarding whether various marital assets were community property.

On April 24, 1988, Serrato assigned the West note and deed of trust to her 20–year–old son, Frank. Although he was not a real estate agent or broker, and "had little or no real estate experience" at that time, Frank was President of FJV Financial, a real estate and loan brokerage company.

---

1. Serrato's Offer in Compromise reads as follows:

1. Debtor under Chapter 13 (3rd filing); and danger exists of being converted to CHAPTER 7, with all debt being discharged.
2. The Note which SBA holds as security has been reassigned by debtor to M. Lopez who took the note and trust deed and recorded same.
3. The default occured [sic] through no fault of debtor; SBA authorized $50K loan extended only $15–16K and Debtor had debt she anticipated paying with SBA loan and which she

could not when SBA defaulted. She closed her business w/debt she could not pay. She then became ill and debt mounted more. Illness now arrested and she wants to begin a new life by paying off debt rather than being forced into CHAPTER 7 and ruining credit forever.*

* If SBA can accept and return her note, Debtor can drop the current CHAPTER 13 and pay off her other debt as well as other creditors have agreed to compromise their debt.

4. Debtor plans to leave Bay area and start fresh somewhere else.

At Serrato's 2004 exam, she claimed she sold the West note and deed of trust to Frank for $5,000 cash. At trial, after Frank testified that he did not know about the West note assignment, Serrato recalled the transaction differently. She explained that Frank had been in a car accident in 1988 and had received $5,000, which he had given to Serrato. Although the gift purportedly came with no strings attached, Serrato felt that in the event that she "died or whatever," she wanted Frank to have the note. She assigned the West note and deed of trust to him, but did not tell him about the assignment. Serrato claimed not to have actually transferred anything through the assignment because the note was already assigned to the SBA. She stated that she intended to buy back the note from the SBA at a later time, to give the assignment value.

Two months later, on July 1, 1988, while still in the process of her annulment from Davenport, Serrato quitclaimed a condominium located at 150 Pearl Street, Unit 325 to Frank. Frank testified that he knew nothing of the transfer. Serrato explained that she put the condominium in Frank's name to keep it from her husband. She justified the transfer by explaining that she had originally used funds from the sale of her separate property in San Leandro to purchase the condominium.

In early September 1988, the Trustee in Davenport's chapter 7 case proposed to settle with Serrato. He agreed to transfer to Serrato the condominium located at 150 Pearl Street, Unit 325, another property located at 1918 102nd Avenue in Oakland, and a vehicle—assets she claimed were her separate property—in exchange for $7,500. As part of the compromise, the trustee had the 102nd Avenue property appraised. The uncertified appraisal indicated that the fair market value of the property was $25,000. The compromise of controversy was approved by the San Francisco Bankruptcy Court.

#### C. The Transfer At Issue.

On September 15, 1988, Serrato quitclaimed the 1918 102nd Avenue property to Frank. The documentary transfer tax information on the quitclaim deed indicates that the property was a gift, with "no loans assumed." There was no escrow of the property, and no writing evidencing a sale of the property. When questioned, both Frank and Serrato gave inconsistent testimony regarding the nature of this transfer.

At Frank's deposition, he claimed the transfer was a gift from Serrato and that any money he received from a subsequent sale of the property was his to keep "free and clear." At trial, however, Frank recanted this deposition testimony, explaining that he had worked a double shift and had drunk a beer immediately prior to his deposition, causing him to make false statements. Frank testified at trial that he and Serrato had an oral agreement that he would turn over any proceeds from the sale of 1918 102nd Avenue to her. He called this arrangement "delayed consideration."

At Serrato's 2004 exam, she claimed that she sold the 102nd Avenue property to her other son, Marc, in 1987 for $44,000. She claimed not to have received any proceeds from the sale because the escrow company disbursed the finds to various lienholders. During the trial, however, Serrato admitted putting the property in Frank's name. She argued that the transfer was not a gift, and that Frank simply held the property for her benefit. She claimed she put it in Frank's name so he could get refinancing for it. She testified that she could not get refinancing on her own due to her bad credit. When asked why she listed the property as a gift on the quitclaim deed, she explained that "that was how they told me to put it in if I wanted to not have to pay transfer taxes."

Five months later, on or about February 15, 1989, Frank sold the 102nd Avenue property to his brother, Marc, for $55,000. Prior to the sale, Frank claimed that he obtained an appraisal showing the value of the property to be between $45,000 and $55,000. Frank testified that the apparent increase in the value of the property was due to significant improvements he made prior to the sale. He explained that the cottage on the property had been damaged by a fire, and asserted that he had relaid all of the flooring, installed new appliances, remodeled the bathrooms, painted inside and out, put on a new roof,

cleared debris, rebuilt the porch and steps, put in a new mailbox, and landscaped. However, neither Frank nor Serrato presented any corroborating evidence, apart from their own testimony, to establish that these improvements actually occurred.

Following the sale to Marc, Frank received two checks totaling $40,314.94. The first check was for $36,717.44. The second, following payment for termite repairs, was for $3,597.50. Frank also received a deed of trust from Marc secured by the property for $5,000, but he forgave this debt. The escrow company advanced approximately $5,536.96 to pay off liens against the property and $4,705 for termite repairs.

On February 17, 1989, Frank deposited $32,824.37 into Home Equity Line Plan (HELP)'s checking account at American Savings Bank. At trial, Serrato testified that she considered this money to be her income. She testified that the American Savings account was her account, although Frank and Marc had access to it to pay bills since she did not enjoy this task. She claimed that she used $15,000 of the proceeds from the sale to buy more equipment for her business, and used the remainder of the money to pay off a few creditors and to buy property. She provided a check from the American Savings account dated February 26, 1989 for $3,500 made out to Kathleen Hendron. She claimed this was to purchase another condominium at 150 Pearl Street. She also presented a grant deed dated March 23, 1989 from John Conley to Serrato for property she professed to have purchased at 2412 Highland Avenue.

Serrato claimed to have no additional records indicating how she spent the proceeds from the sale of the 102nd Avenue property. However, several checks that Marc wrote from the American Savings account around February 17, 1989 were submitted at trial attached to the back of a defense exhibit. These checks provided insight regarding the use of proceeds from the sale of the 102nd Avenue property. For example, on February 16, 1989, Marc wrote a check for $5,021.50 to a woman who later became his wife. Serrato claimed this was a payment from an investment. On February 17, Marc wrote a check to Phyllis' husband for $6,739.50. Serrato claimed this was for repayment of a personal loan. On February 21, Marc wrote a check to "Cash" for $2,700. Serrato claimed this was for Marc's salary.

### D. The Instant Bankruptcy Case.

On September 14, 1990, Serrato filed a chapter 7 case in San Jose. In her statement of affairs, she stated her annual income for 1988 and 1989 as $9,000 and $10,000, respectively. Despite her experience in having filed at least three prior bankruptcy cases, Serrato explained that it was her belief that the statement of affairs sought her "net income." She did not mention the $32,824.37 she received from the sale of the 102nd Avenue property. She listed only a chapter 13 case from 1983 as a prior bankruptcy case.

In Serrato's schedules she listed total assets of $152,700 and total debts of $236,867.92. She did not list the West note as an asset. She did not list the condominium at 150 Pearl Street acquired in 1989 or the 2412 Highland Avenue property as assets. Despite her testimony at trial that her business equipment was worth $47,000 in 1990, she listed it as having a value of only $700 and claimed it as exempt. She listed the SBA as an unsecured creditor for a $26,000 debt. She signed a declaration, under penalty of perjury, stating that this information was true to the best of her knowledge, information and belief.

On October 18, 1990, the First Meeting of Creditors was held and the trustee filed a Report of No–Asset Case. On January 11, 1991, Serrato received a discharge of her debts. On March 14, 1991, the chapter 7 case was closed.

In April of 1991, while prosecuting a state court action against Serrato, attorney David McKim obtained information indicating that Serrato might have fraudulently transferred assets to family members. He contacted the trustee with this information. Soon thereafter, the trustee sought an order from the court for authority to employ McKim as special counsel to investigate these claims.

In August of 1991, the trustee filed two adversary complaints for fraudulent conveyance actions. Both the trustee and trustee's

counsel were apparently unaware that the main case had closed. Adversary number 91–5309 concerned the status of the West note and deed of trust. Adversary number 91–5323 was an action to set aside the transfer of 1918 102nd Avenue to Frank.

In the 91–5309 proceeding, the trustee obtained an order from the court compelling Marc to appear at a 2004 examination. Marc brought a motion to vacate this order for lack of subject matter jurisdiction. He argued that the adversary proceedings were improperly filed because the bankruptcy case was closed and the trustee had never moved to reopen the case. On February 5, 1992, the court signed an order vacating the Order of Examination for lack of subject matter jurisdiction. That same day, Serrato filed a motion to dismiss adversary number 91–5309 for lack of subject matter jurisdiction.

On February 14, 1992, Serrato recorded a reconveyance of the West note from Mercy Lopez to herself. She also recorded her assignment of the note to Frank, and an assignment of the note from Frank to her friend, Rebecca Rangel.

On February 21, 1992 the trustee filed a motion to vacate the closing of the main case, or alternatively, to reopen the main case. The trustee's motion, and Serrato's motion to dismiss adversary number 91–5309, were heard on March 6, 1992. At the hearing, the trustee's counsel expressed serious concerns about the effect of dismissal of the adversary proceeding and whether further proceedings would be barred by the statute of limitations. Ultimately, the court dismissed adversary number 91–5309 for lack of subject matter jurisdiction, but granted the trustee's motion to reopen the chapter 7 case.

On July 16, 1992, the trustee commenced this adversary proceeding to set aside the transfer of 1918 102nd Avenue to Frank. On July 27, 1992 Serrato converted the main case to chapter 13 and became debtor-in-possession. While acting as debtor-in-possession, she attempted to dismiss the instant adversary proceeding by filing a notice of dismissal. Dismissal was rejected by the court, and the case was reconverted to chapter 7 on March 31, 1993.

Serrato was deposed on June 30, 1993. She refused to answer any question that was put to her on Fifth Amendment grounds. Frank was deposed on August 17, 1993, but later recanted his deposition testimony.

On November 1, 1994, the trustee identified the SBA as the requisite creditor whose claim existed at the time of the transfer and indicated that the trustee intended to call the SBA's custodian of records as a witness at trial. After numerous procedural disputes, including two defense motions to dismiss the case, trial of this matter commenced on February 10, 1995. Due to the unanticipated length of the trial and the intervening motions, closing arguments were not heard until March 21, 1997.

### III. ANALYSIS

The crux of this adversary proceeding is the trustee's allegation that Serrato quitclaimed the 102nd Avenue property to Frank in an attempt to defraud her creditors. The trustee relies on Bankruptcy Code § 544(b) to bring this action.[2] Section 544(b) allows the trustee to stand in the shoes of a defrauded unsecured creditor to bring an avoidance action under state law. Here, the trustee relies on the SBA's claim against Serrato to bring an action against Frank based on California fraudulent transfer law. The trustee maintains, in pertinent part, that Serrato's transfer of the 102nd Avenue property to Frank was intentionally fraudulent based on California Civil Code section 3439.04(a).[3] For the following reasons, the court agrees.

---

2. Because the alleged fraudulent transfer took place on September 15, 1988, two years prior to the date Serrato filed her chapter 7 case on September 14, 1990, the trustee is precluded from using the avoidance powers specified in Bankruptcy Code § 548.

3. Civil Code section 3439.04(a) provides that:
A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
 (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
The trustee also argued the transfer was constructively fraudulent based on Civil Code section 3439.05.

### A. The Trustee's Action Is Not Barred By Bankruptcy Code § 546(a)'s Statute Of Limitations.

Civil Code section 3439.09(a) requires that an avoidance action be brought within four years of the date of the alleged fraudulent transfer, or within one year after plaintiff could have reasonably discovered the transfer. Cal.Civ.Code § 3439.09(a) (West 1997). Here, the trustee's avoidance action was filed on July 16, 1992, within the four year statute of limitations. However, Bankruptcy Code § 546(a) imposes an overriding statute of limitations for § 544(b) actions. *Mahoney, Trocki & Assocs. v. Kunzman (In re Mahoney)*, 111 B.R. 914, 919–920 (Bankr.S.D.Cal. 1990); *McGoldrick v. McGoldrick (In re McGoldrick)*, 117 B.R. 554, 560–561 (Bankr. C.D.Cal.1990). Section 546(a) provides that an action under § 544 is barred after the earlier of either a) two years from the date of the appointment of a trustee, or b) the dismissal *or close* of the bankruptcy case.[4] (Emphasis added.)

▆▆▆ Frank argues that the trustee's action is barred by § 546(a)'s statute of limitations because Serrato's chapter 7 case closed in March of 1991. This argument ignores § 350(b)'s mandate that the court shall close a case only after the estate is fully administered. *Gross v. Petty (In re Petty)*, 93 B.R. 208, 211 (9th Cir. BAP 1988). The case has not been fully administered pursuant to § 350(b) and is not properly and finally closed where the court discovers a potential asset that the debtor has failed to disclose in a bankruptcy petition, which may be administered and may result in the return of money to the estate. *Id.* If the two year statute of limitations under § 546(a) has not tolled, the trustee is not barred from bringing an avoidance action merely because the estate was closed under the mistaken assumption that it had been fully administered. *Id.* at 212. The trustee should not be penalized for delay where it results in part from debtor's concealment of information. *Id.* at 211–213.

▆▆▆ In the present case, the two year statute of limitations under § 546(a) had not tolled when the trustee filed this adversary proceeding. The chapter 7 trustee was appointed by order entered on September 19, 1990. The trustee filed this adversary proceeding twenty-two months after her appointment, on July 16, 1992. Accordingly, the trustee's action was not barred by § 546(a)'s statute of limitations.

▆▆▆ Frank further contends that the trustee's suit should be barred by laches. California Civil Code section 3439.10 provides that principles of law and equity, including the defense of laches, apply in a fraudulent transfer action. However, the doctrine of laches does not operate as a bar to an avoidance claim that is timely under Bankruptcy Code § 546(a). *In re Petty*, 93 B.R. at 212.

### B. The Trustee Has Standing to Bring This Action Under Bankruptcy Code § 544(b).

Bankruptcy Code § 544(b) provides that "[t]he trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title...." 11 U.S.C.A. § 544(b) (West 1997). To set aside the transfer of the 102nd Avenue property using § 544(b), the trustee must show that the SBA had an allowable unsecured claim at the time the transfer was made and could have avoided the transfer under California law. Frank claims that the trustee lacks standing to bring this action under § 544(b) because the SBA's claim is barred by the applicable statute of limitations and is not unsecured.

#### 1. *The SBA's Claim Is Not Barred by 28 U.S.C. § 2415's Statute of Limitations.*

All parties concede that the SBA's claim is subject to the six year statute of limitations for federal actions on contracts, set forth at 28 U.S.C. § 2415. However, the parties dispute at what point the SBE's right of action against Serrato accrued. The SBE note contained both a clause providing for automatic acceleration of the underlying debt in the event that Serrato filed a case under Title 11, and a clause providing for optional accelera-

---

4. This is the version of § 546(a) as it existed in 1988.

tion by the SBE in the event Serrato failed to make a payment when it came due. The parties disagree as to whether Serrato's default under either clause activated the running of § 2415's statute of limitations.

Frank argues that because Serrato filed a chapter 11 case in 1983, this triggered the automatic acceleration clause.[5] He claims the SBA's right of action accrued at that time, and the statute of limitations expired six years later, in 1989. The trustee responds that dismissal of Serrato's chapter 11 case nullified the acceleration clause and that the *res ipsa* provisions of the Bankruptcy Code are not applicable to loans.

■ Bankruptcy Code § 349(b) provides that dismissal "reinstates proceedings or custodianships that were superseded by the bankruptcy case, reinstates avoided transfers, reinstates voided liens, vacates any order, judgment, or transfer ordered as a result of the avoidance of a transfer, and revests the property of the estate in the entity in which the property was vested at the commencement of the case." H.R.Rep. No.595, 95th Cong., 1st Sess. § 349 (1977). The basic purpose of § 349(b) is to "undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case." *Id.* Generally, dismissal of a bankruptcy case reestablishes the rights of the parties as they existed when the petition was filed, and restores the pre-bankruptcy status quo. *Derrick v. Grafe Commodities, Inc. (In re Derrick)*, 190 B.R. 346, 350 (Bankr. W.D.Wis.1995). "It is as though the bankruptcy case never had been brought." *In re Lewis & Coulter, Inc.*, 159 B.R. 188, 190 (Bankr.W.D.Pa.1993).

■ There are certain exceptions to § 349's directive to restore the pre-bankruptcy status quo. Dismissal does not necessarily "undo" the bankruptcy case where parties have obtained rights in reliance on the case. *In re Derrick*, 190 B.R. at 352–353. For example, § 349(b) does not "encompass undoing sales of property from the estate to a good faith purchaser." H.R.Rep. No.595,

95th Cong., 1st Sess. § 349 (1977). Dismissal does not always divest the bankruptcy court of jurisdiction over related cases. *Carraher v. Morgan Electronics, Inc. (In re Carraher)*, 971 F.2d 327, 328 (9th Cir.1992). Dismissal does not automatically moot a proceeding for damages for willful violation of the automatic stay. *Davis v. C.G. Courington (In re Davis)*, 177 B.R. 907 (9th Cir. BAP 1995). Dismissal does not necessarily eliminate the collateral estoppel or res judicata effect that a bankruptcy court decision made during a bankruptcy case has in a later proceeding. *United States v. Standard State Bank*, 91 B.R. 874 (W.D.Mo.1988), *aff'd* 905 F.2d 185 (8th Cir.1990). Here, however, the SBA did not assert its rights to the underlying collateral upon acceleration of the debt, or gain any rights in reliance on the bankruptcy case. Accordingly, the trustee is correct that dismissal would nullify the effect of the automatic acceleration clause in this case.

Frank further argues that the SBA's claim is barred since Serrato's SBA loan went into collection status in October 1980 and the trustee did not file this action until twelve years later. The trustee first responds that the SBA's right of action did not accrue until August 1985, ninety days after it received Serrato's "Offer in Compromise," basing this result on *Curry v. United States Small Business Administration*, 679 F.Supp. 966 (N.D.Cal.1987).

In *Curry*, Judge Orrick considered the issue of when the SBA's right of action to collect on a promissory note accrued. The SBA had loaned Curry $21,000 in 1970 in exchange for a promissory note secured by a deed of trust. In 1974, Curry defaulted. For the next three years, the parties negotiated regarding a suitable repayment plan. In July 1978, the SBA wrote to Curry citing the defaulted status of her loan and threatened to foreclose on her home. Curry responded with an *Offer in Compromise*; however, the SBA failed to acknowledge this offer and took no action.

Judge Orrick observed that:
 ... "a party is not at liberty to stave off operation of the statute [of limitations] in-

---

5. The same argument can be made with regards to Serrato's 1984 chapter 13 case.

ordinately by failing to make a demand." In such cases, "when statutorily unstipulated, the time for demand is ordinarily a reasonable time ... [and] a matter of the parties' expectations...."

*Id.* at 969–970 (citations omitted). The Court determined that the SBA's right of action accrued ninety days after it received Curry's Offer in Compromise, and held that the SBA's claim was barred by the statute of limitations. *Id.* at 970.

■ Prior to May 1985, Serrato testified at trial that she was "negotiating" with the SBA regarding her loan. She also testified that the SBA demanded its collateral around that time. As the Ninth Circuit has noted, "imposing a narrow time frame in which the government must demand acceleration would impede its efforts to work out payments with solvent but financially troubled borrowers." *United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1491 (9th Cir.1993). Here, as in *Curry*, it appears that 90 days after receipt of Serrato's Offer in Compromise was a reasonable time for the SBA to have made its demand for payment. Accordingly, the SBA's right of action accrued in August 1985.

■ Frank again argues that the action is untimely since Serrato's chapter 7 case first closed in March 1991, the six year statute of limitations under 28 U.S.C. § 2415 would have expired in August 1991 and the trustee did not file this action until July 16, 1992. However, since Serrato failed to disclose potential assets, her estate was never fully administered properly and finally closed in March 1991 for Bankruptcy Code § 350(b) purposes. *See Gross v. Petty (In re Petty)*, 93 B.R. 208, 211 (9th Cir. BAP 1988). Accordingly, Bankruptcy Code § 108(c) tolled the six year statute of limitations [6] and the trustee's action was timely filed.

### 2. The SBA's Claim Against Serrato Is Unsecured.

■ Next, Frank maintains that the SBA's claim is fully secured. He relies on the testimony of Idamari Taylor, the SBA loan officer who handled the SBA's loan to Serrato, that the loan was originally secured and the SBA never released its security interest. However, Taylor also testified that the SBA declined to foreclose on the collateral because the business and personal property securing the loan were of little or no value, and the West note was uncollectible. Taylor noted that the SBA was unable to record the West note because it lacked the underlying deed of trust. She added that, as of September 14, 1990, the $16,900 loan had grown to a debt of $29,441.93, reflecting past due interest.

Serrato's testimony regarding the secured nature of the claim was contradicted by the evidence. When she testified that the West note was worth $40,000 based on accrued interest and advances she made to senior lienholders on the West property, the trustee introduced into evidence a judgment obtained by Guy West in 1990 setting the correct loan balance due on the West note as of July 1, 1988 as $21,792.26. When Serrato testified that the West note was constantly in default after 1988, the trustee submitted into evidence nine checks from Guy West made payable to Serrato from 1989 to 1990 for $330.33 each. Serrato responded that she had never received the checks, although they are endorsed with the name "Sophie Serrato." She denied that the endorsement was her signature. When asked how the SBA could have foreclosed on the West note after she transferred it to Mercy Lopez and to Frank, Serrato claimed, without corroborating evidence, that the transfers "excepted" the SBA's interest in the note.

Serrato's bankruptcy schedules also contradict her testimony. She did not list the West note as an asset in her schedules. She testified that her business property securing the SBA loan was worth $47,000 in 1990, but listed this equipment in her schedules as having a value of $700. Finally, she testified

---

**6.** Bankruptcy Code § 108(c) states "if applicable nonbankruptcy law .... fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor, .... and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) 30 days after notice of the termination or expiration of the stay under section 362, 922, 1201 or 1301 ...."

that the SBA loan was secured by $90,000 of collateral; yet she listed the SBA in her bankruptcy schedules as an unsecured creditor with a claim of $26,000.

Because of inconsistencies in Serrato's testimony and in her bankruptcy schedules, the court finds her testimony unreliable. The preponderance of credible evidence indicates that the SBA's loan was largely unsecured on September 15, 1988. Any unsecured portion of the loan at the time of the transfer of the 102nd Avenue property became an unsecured claim. *See* 11 U.S.C. § 506(a); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 239–240, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989).

**C. Serrato Transferred the 102nd Avenue Property To Frank With Actual Intent To Defraud Her Creditors.**

■ To prevail in a fraudulent transfer action based on Civil Code section 3439.04, the trustee bears the burden of proving that Serrato quitclaimed the 102nd Avenue property to Frank with actual intent to hinder, delay or defraud her creditors by a preponderance of the evidence. *Whitehouse v. Six Corp.*, 40 Cal.App.4th 527, 533, 48 Cal. Rptr.2d 600, 604 (1995), *citing Liodas v. Sahadi*, 19 Cal.3d 278, 292, 137 Cal.Rptr. 635, 644, 562 P.2d 316, 325 (1977). Rarely will a debtor admit to transferring property with an actual intent to defraud creditors. Because of this difficulty in obtaining direct proof, "in most cases the evidence must of necessity consist of inferences drawn from the circumstances surrounding the transaction and the relationship and interests of the

parties." *Neumeyer v. Crown Funding Corp.*, 56 Cal.App.3d 178, 183, 128 Cal.Rptr. 366, 369 (1976).

California adopted the Uniform Fraudulent Transfer Act, which is codified in Civil Code section 3439 et seq. The Uniform Fraudulent Transfer Act contains a list of factors, or "badges of fraud," indicative of actual intent to defraud.[7] *Lyons v. Security Pacific Nat. Bank*, 40 Cal.App.4th 1001, 1020–1021, 48 Cal.Rptr.2d 174, 185 (1995). The California Legislative Committee chose not to include the badges of fraud in the statute, but added them to the official comments. In doing so, the Committee noted that the presence of one or more of these badges does not give rise to a presumption of fraud, but "is merely evidence from which an inference of fraudulent intent may be drawn." 12 West's Ann.Civ.Code § 3439.04 (1997 supp.) p. 191 (Assem. Committee Comm. (1986)).[8] The trustee has established numerous badges of fraud with regards to Serrato's transfer of the 102nd Avenue property to Frank.

1. *Serrato Transferred the 102nd Avenue Property To An Insider.*

■ First, the trustee correctly points out that Serrato's transfer of the 102nd Avenue property to her son Frank was a transfer between insiders. The relationship of parent and child, when coupled with other suspicious circumstances, gives rise to an inference of fraud. *Wood v. Kaplan*, 178 Cal.App.2d 227, 230, 2 Cal.Rptr. 917, 919 (1960). In such cases, "the parties are held

7. Courts have relied on badges of fraud to "identify fact patterns from which fraud could be construed" since the time of the English common law. *See* Sandra E. Mayerson et al., *Four Centuries of Fraudulent Conveyance Law In Forty Minutes: Its Continuing Development And Application*, 652 P.L.I./Comm. 31, 33 (1993).

8. The Committee provided the following as a non-exclusive list of appropriate factors to consider in determining the existence of actual intent to hinder, delay, or defraud a creditor: (1) Whether the transfer or obligation was to an insider. (2) Whether the debtor had retained possession or control of the property transferred after the transfer. (3) Whether the transfer or the obligation was disclosed or concealed. (4) Whether the debtor was sued or threatened with

suit before the transfer was made or obligation was incurred. (5) Whether the transfer was of substantially all the debtor's assets. (6) Whether the debtor has absconded. (7) Whether the debtor or has removed or concealed assets. (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred. (10) Whether the transfer had occurred shortly before or shortly after a substantial debt was incurred. (11) Whether the debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor. *Id.*

to a fuller and stricter proof of the consideration, and of the fairness of the transaction." *Id.* (citations omitted).

### 2. *Serrato Retained Control Over the 102nd Avenue Property.*

Serrato and Frank freely admit that Serrato retained control over the 102nd Avenue property after the transfer. Serrato testified that she considered the property to be hers, that the proceeds from the sale were hers and that she put the property in Frank's name only to get refinancing. She claims to have paid for all of the purported repairs to the property. Frank, after recanting his deposition testimony, supported Serrato in these assertions.

### 3. *Serrato and Frank Concealed the Transfer.*

Serrato and Frank actively concealed the transfer of the 102nd Avenue property. An agreement between parties to conceal a transfer from the public is said to be one of the strongest badges of fraud. *Walton v. First National Bank*, 13 Colo. 265, 22 P. 440 (1889). There was no writing evidencing a sale of the 102nd Avenue property to Frank, and no escrow. At her 2004 exam, Serrato testified that she sold the property to Marc in 1987 and that all funds were disbursed to lienholders. When asked about the transfer at her deposition, Serrato refused to answer the question on Fifth Amendment grounds. Moreover, the transfer took place during Serrato's contested marital annulment, where, in a six month period, she put the West note, Unit 325 at the Pearl Street condominium and the 102nd Avenue property in Frank's name.

### 4. *Serrato Was Threatened With Suit Before She Transferred The Property.*

Serrato testified at trial that she was threatened with suit before she made the transfer. She stated that many of the creditors she listed in her bankruptcy schedules were actually creditors of her ex-husband. She listed them because "I just did not want to be part or [sic] sued for something that he had done."

### 5. *Serrato Has Removed and Concealed Assets.*

Serrato carried out a practice of removing and concealing assets. For example, she put the West note in Mercy Lopez' name without telling Lopez, and filed a chapter 11 case two months later. She put the Pearl Street condominium in,mark Davenport's name for the express purpose of concealing her ownership. She later put the Pearl Street condominium in Frank's name without telling him. She testified at trial that she did this to keep the condominium from her ex-husband. She also transferred the West note to Frank without telling him.

Serrato failed to list assets in her bankruptcy schedules. She failed to list the Pearl Street condominium that was later acquired in 1989 or the 2412 Highland Avenue property as assets. She made no mention of the $32,824.37 she obtained from the sale of the 102nd Avenue property.

Finally, Serrato refused to provide a straightforward accounting of her assets. When asked about the status of certain assets at her 2004 examination, she gave untruthful or deceptive answers. At her deposition, she refused to answer any questions on Fifth Amendment grounds.

### 6. *The Transfer Involved No Consideration.*

Serrato received no consideration from Frank in return for the quitclaimed property. The quitclaim deed states that the property was a gift. There were no funds exchanged, and Serrato maintains that Frank merely held the property for her benefit.

Frank contends that the 102nd Avenue property was overencumbered when Serrato transferred it to him in September of 1988 and that his agreement to take on the debt constituted consideration. He points out that an appraisal obtained by the trustee in Mark Davenport's chapter 7 case stated the fair market value of the property in June of 1988 as $25,000. He also testified that he believed the property was worth between $17,000 and $20,000 in 1988.

Serrato testified that at the time she transferred the property to Frank, it was subject

to $36,500 in liens. These liens were: a $6,500 mechanic's lien in favor of G & H Construction; a $9,000 child support lien in favor of Dorma Acker; a $16,000 first deed of trust held by Frances and George Clemons; tax liens in excess of $3,000 and refuse liens in excess of $2,000. To support the existence of these liens, Frank submitted as an exhibit a preliminary title report dated June 29, 1988.

The title report is inconclusive and unpersuasive. It indicates that G & H Construction had a mechanic's lien for $6,495 as of January 20, 1987. There is no mention of the balance of this lien as of September 15, 1988. The title report contains no record of Acker's purported child support lien. Instead, Frank has attached a demand letter from Acker's attorney, and an unsigned document authorizing the escrow company to withhold $9,224.00 from escrow of the sale to Marc, to be paid to Acker's attorney. Finally, the title report indicates that the Clemonses were the beneficiaries of a $14,000 deed of trust on the property, to secure repayment of an obligation owed by Archie Acker. The Clemonses assigned their interest in this deed of trust to Mark Davenport on January 27, 1987. Thus, there is no corroborating evidence to establish that the property was sold subject to the G & H mechanic's lien, the Acker child support lien or the Clemons deed of trust. In fact, the escrow closing statement from Frank's sale of the property to Marc indicates that the escrow company paid only the tax liens and refuse liens on the property. For these reasons, the court concludes that the property was not overencumbered when Serrato quitclaimed it to Frank.

### 7. *Serrato and Frank Gave Unreliable Testimony.*

Compounding these six badges of fraud is the fact that Serrato and Frank's testimony was entirely unreliable. Their credibility was damaged by numerous inconsistencies between the testimony they gave during discovery and the testimony they' presented at trial. Even where their testimony was not inconsistent, it was often marked by suspicious vacillation. For example, when Frank and Serrato were asked to identify their signatures on certain documents at trial, they both gave evasive responses. Frank stated that, "my signature doesn't look like that now, but it might have at that time." Serrato stated "Well, I don't sign it like that anymore, Your Honor, so I'm not sure if this is my signature or not." Moreover, Serrato's claimed ignorance of real estate transactions, security interests and bankruptcy procedure was highly disingenuous in light of her business as a real estate consultant "in the business of mitigation of foreclosures," her legal education, and her personal experience in having filed at least three other bankruptcy cases.

The evidence clearly establishes that when Serrato quitclaimed the 102nd Avenue property to Frank, her intent was to conceal her ownership of the property, to cloud the title, and to defraud her creditors. The court is satisfied that the trustee has met her burden of proving actual fraud under Civil Code section 3439.04.

### D. The Trustee Can Recover the Value of the Entire Transfer.

Although Civil Code section 3439.07 limits a creditor's recovery in a fraudulent transfer action to the amount necessary to satisfy the creditor's claim, this section is not controlling. The Bankruptcy Code separates "the concepts of avoiding a transfer and recovering from the transferee." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 808 (9th Cir.1994) (citing H.R.Rep. No. 595, 95th Cong. 1st Sess. 375 (1977)). Although the trustee has demonstrated her right to recovery under state law, she must still establish the amount of recovery pursuant to § 550(a) of the Bankruptcy Code. *In re Acequia*, 34 F.3d at 809.

Section 550(a) provides that:

. . . to the extent that a transfer is avoided under section 544 . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer . . .; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). The *Acequia* Court recognized that "[a] transaction that is voidable

by a single, actual unsecured creditor [under § 544(b)] may be avoided in its entirety, regardless of the size of the creditor's claim." *In re Acequia*, 34 F.3d at 809, *citing Harris v. Huff (In re Huff*, 160 B.R. 256, 261 (Bankr. M.D.Ga.1993)); *see also Moore v. Bay (In re Estate of Sassard & Kimball, Inc.*), 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931).

 Section 544(b) provides for avoidance of the debtor's "interest" in transferred property. Unfortunately, the Code provides no real instruction as,to how to value a debtor's "interest." *In re American Furniture Outlet USA, Inc.*, 209 B.R. 49, 51 (Bankr. M.D.N.C.1997). Moreover, though § 550(a) enables a trustee to recover the value of transferred property, "the statute does not define 'value,' nor indicate at what time 'value' is to be determined." *Id.* However, "the purpose and thrust of [§ 550] is to restore the debtor's financial condition to the state it would have been had the transfer not occurred." *Reiber v. Baker (In re Baker)*, 17 B.R. 392, 395 (Bankr.W.D.N.Y.1982); *see also Aero–Fastener, Inc. v. Sierracin Corp. (In re Aero–Fastener, Inc.*), 177 B.R. 120, 139 (Bankr.D.Mass.1994) (and cases cited therein). Here, the trustee seeks to recover $45,314.94 from Frank, which she claims is the value of Serrato's equity in the 102nd Avenue property. This amount includes the $40,314.94 that Frank received from escrow, and the $5,000 debt that Frank forgave. The court agrees that $45,314.94 is the appropriate measure of recovery pursuant to sections 544(b) and 550(a).

## IV. CONCLUSION

Because the court finds that the trustee has met her burden of proving that Serrato fraudulently transferred the 102nd Avenue property to Frank with an actual intent to defraud her creditors, the trustee is entitled to recover $45,314.94, the value of Serrato's equity in the property, from Frank Voisenat.