
**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>MICHAEL WILLIAM DEVINE,<br>         Debtor. | BAP No. CC-21-1238-LGT |
| | Bk. No. 8:18-bk-10905-MW |
| MICHAEL WILLIAM DEVINE,<br>         Appellant,<br>v.<br>UNITED STATES TRUSTEE,<br>         Appellee. | Adv. No. 8:19-ap-01095-MW<br><br>**MEMORANDUM** |

Appeal from the United States Bankruptcy Court
for the Central District of California
Mark S. Wallace, Bankruptcy Judge, Presiding

Before: LAFFERTY, GAN, and TAYLOR, Bankruptcy Judges.

## INTRODUCTION

Chapter 7[1] debtor Michael William Devine appeals the bankruptcy

court's judgment denying his discharge under §§ 727(a)(2)(A) and (a)(3).

We AFFIRM.

---

      *This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

      [1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

1

## FACTS

In 2005, Debtor formed Devine Design, a home remodeling business, as a sole proprietorship. Debtor has a high school education and has completed a certificate program at Interior Designers Institute in Newport Beach, California. Before forming Devine Design, he worked as a laborer in the construction industry and held a position in sales and management at California Bath Restoration.

Devine Design began experiencing financial difficulty in 2017, which eventually led to the shutdown of the business. Debtor began subcontracting more work, which created financial problems. He obtained merchant cash advances from hard money lenders that charged approximately 45% per annum. These included a $258,000 advance from Yellowstone, $68,000 from Cap Call, and $10,338.66 from Millstone. Devine Design defaulted on the hard money loans in November 2017; the lenders obtained confessions of judgment and began levying Debtor's Wells Fargo bank account.

Around this time, Debtor was hospitalized twice for high blood pressure. He also experienced depression and three bouts of pneumonia, all of which he attributed to working fifteen-hour days seven days per week and sleeping only four hours a night for seven years.

During the same period, Devine Design moved its warehouse to a new location. Debtor did not supervise the move, and he afterwards discovered that $50,000-$60,000 worth of tools were missing. Other errors,

which Debtor attributed to his employees, consisted of ordering materials with the wrong dimensions or shipping them to the wrong address. Because of these issues, Debtor lost track of Devine Design' expenses on a project-by-project basis.

Debtor maintained a bank account at California Bank & Trust Company. In December 2017 he opened a second bank account at Wells Fargo Bank. Debtor used both bank accounts for business and personal transactions, that is, he commingled business and personal funds and used those funds to pay both business and personal expenses.

After the hard money lenders began levying the Wells Fargo account, Debtor closed it. He then arranged for his girlfriend to cash checks on his behalf so that Devine Design could continue to make payroll and continue its construction projects. He opened a new account at Orange County Credit Union ("OCCU"), depositing a check for $2,809.20 on February 7, 2018. Debtor testified that he opened the OCCU account so Devine Design could continue operating the business without further levies by Cap Call and Yellowstone.

Debtor filed a chapter 7 petition on March 19, 2018. After gathering evidence from the § 341(a) meeting and a Rule 2004 examination, the United States Trustee ("UST") filed a complaint in May 2019 seeking denial of discharge under §§ 727(a)(2), (a)(3), and (a)(5). The parties had previously stipulated that, to assist the UST in determining the disposition of funds received from his customers, Debtor would produce all

documents related to Schedule F claims of Devine Design' former customers, including written agreements, contracts, invoices, and purchase orders. Debtor did not produce those documents. He did, however, produce bank statements, deposit slips, and canceled checks from his three bank accounts for calendar year 2017 through August 31, 2018.

Using the banking information that was produced, the UST's paralegal, Michele Steele, attempted to reconcile the payments by former customers with the bank statements and related documents, but she was unsuccessful. The UST filed Ms. Steele's declaration explaining her attempts in October 2020. In his trial brief filed in September 2021, Debtor unsuccessfully attempted to tie the known customer payments to deposits on the bank statements. At trial, Debtor's counsel stated that information regarding specific projects was recorded on QuickBooks, but no such documentation was provided. Instead, Debtor produced financial reports containing hundreds of pages of information on the expenses of Devine Design, but virtually nothing regarding income, other than total sales figures.

By agreement of the parties, all trial testimony was by declaration; the parties waived their right to cross-examine. After hearing argument on the date set for trial, the bankruptcy court issued its memorandum decision and order denying Debtor's discharge under §§ 727(a)(2)(A) and (a)(3); it found for Debtor on the § 727(a)(5) claim. *U.S. Tr. v. Devine (In re Devine)*, 633 B.R. 626 (Bankr. C.D. Cal. 2021). Debtor timely appealed.

4

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Did the bankruptcy court err in denying Debtor's discharge under § 727(a)(3)?

Did the bankruptcy court err in denying Debtor's discharge under § 727(a)(2)(A)?

## STANDARDS OF REVIEW

"In an action for denial of discharge, we review: (1) the bankruptcy court's determinations of the historical facts for clear error; (2) its selection of the applicable legal rules under § 727 de novo; and (3) its determinations of mixed questions of law and fact de novo." *Hussain v. Malik (In re Hussain)*, 508 B.R. 417, 421 (9th Cir. BAP 2014) (citing *Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (9th Cir. BAP 2004), *aff'd*, 212 F. App'x 589 (9th Cir. 2006)). De novo review means that we review the matter anew, as if the bankruptcy court had not previously decided it. *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014).

Whether a debtor failed to maintain and preserve adequate records is a finding of fact that we review for clear error. *In re Hussain*, 508 B.R. at 424. Factual findings are clearly erroneous if they are illogical, implausible, or without support from inferences that may be drawn from the facts in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

## DISCUSSION

### A. The bankruptcy court did not err in denying Debtor's discharge under § 727(a)(3).

Section 727(a)(3) provides that a court shall grant a debtor's discharge unless the debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]" A plaintiff objecting to discharge under this section must demonstrate "(1) that the debtor failed to maintain and preserve adequate records, and (2) such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994) (citation omitted). The burden of proof then shifts to the debtor to justify the inadequacy or nonexistence of the records. *Id.* The purpose of § 727(a)(3) "is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *Id.* (citation omitted).

Here, although Debtor produced bank statements and documentation of expenses, he was unable to provide documentation to help match deposits with payments known to have been made to Devine Design by former customers. This made it impossible for the UST to ascertain the source of Debtor's revenues. From these undisputed facts, the bankruptcy court concluded that the UST had established a failure to keep

adequate records that made it impossible to ascertain the Debtor's financial condition. Nor did Debtor offer any justification for his failure to keep adequate records. Although he argued in the bankruptcy court that his illnesses kept him from keeping adequate records, he provided no evidence that he had ever done so, even before he became ill. The bankruptcy court also rejected the explanation offered by Debtor's counsel at trial that the reason payments could not be matched with deposits was that Square, the credit card processor, included in a single deposit several payments made by different customers.[2]

On appeal, Debtor argues that the bankruptcy court erred in three ways: (1) by not explaining why it was necessary to reconcile the customer payments with the bank statements to ascertain Debtor's financial condition; (2) by denying Debtor an opportunity to testify regarding how Square worked and attempting to reconcile the customer payments with the bank statements; and (3) by concluding that the customer payments could not be reconciled with the bank statements when Debtor's trial brief identified the payments in a manner sufficient to ascertain Debtor's financial condition. We are not persuaded by these arguments.

---

[2] The bankruptcy court also found it implausible that Debtor could have run his business without some mechanism for tracking customer payments. The court thus inferred the existence of such records. Accordingly, the court found, as an independent ground under § 727(a)(3), that Debtor had concealed those records. Because we conclude that the record supports the conclusion that Debtor failed to keep adequate records, we need not analyze the propriety of this finding.

7

Section 727(a)(3) "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." *Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 762 (9th Cir. 2008) (citations omitted). The bankruptcy court's findings that Debtor failed to keep adequate records and that Debtor's trial brief did not adequately reconcile customer payments with the bank statements is not illogical, implausible, or without support in the record. The bankruptcy court did not need to explain why Debtor's financial condition could not be adequately ascertained. The court implicitly found that the information provided did not reasonably provide a "true presentation" of the Debtor's financial affairs. As for Debtor's complaint that he was not permitted to testify regarding how Square worked, his counsel did not request that he be permitted to testify, nor does Debtor explain how such testimony would have changed anything or why he could not have provided documentation from Square that showed the detail of each transaction. There was no due process violation. As pointed out by the UST, Ms. Steele's declaration was filed October 30, 2020, nearly a year before the trial, so there was ample opportunity for Debtor to have provided a complete reconciliation. He did not do so.

**B.    The bankruptcy court did not err in denying Debtor's discharge under § 727(a)(2)(A).**

Section 727(a)(2)(A) provides that a court shall grant a debtor's discharge unless "the debtor, with intent to hinder, delay, or defraud a

creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." The term "transfer" includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property; or . . . an interest in property." § 101(54)(D).

To prevail on a claim under § 727(a)(2)(A), the plaintiff must demonstrate two elements, both occurring within one year of the petition date: (1) a disposition of property, such as transfer or concealment; and (2) a subjective intent on the debtor's part to hinder, delay, or defraud a creditor through the act disposing of the property. *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997).

The bankruptcy court found that all elements of the claim were met because: (1) Debtor made a transfer when he deposited the $2,809.80 check into the OCCU account; (2) the transfer occurred within one year of the petition date; and (3) Debtor admitted that he opened the OCCU account so that Devine Design could continue operating without levies by Cap Call and Yellowstone, which established intent to hinder and delay those creditors.

Debtor does not dispute either the timing or the intent element, but he disputes the finding that the deposit into the OCCU account was a "transfer" within the meaning of § 727(a)(2)(A).

The Ninth Circuit has concluded that a withdrawal from a bank account, if done with the requisite intent, may qualify as a transfer for

purposes of § 727(a)(2)(A). *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1282 (1996). In that case, the debtors, after being served with notice that a creditor was applying for a temporary protective order, withdrew significant funds from their personal and business bank accounts and put the cash in a safe at their home. *Id.* at 1281. The debtors admitted they made the withdrawals to fend off the creditor's attempts to reach their assets. They argued that the withdrawals were not transfers because they were merely moving assets from one of their own "pockets" to another. *Id.* at 1282.

The court of appeals rejected this argument. Although it acknowledged that the withdrawals did not reduce the assets available to creditors, it held that this was not a prerequisite to denial of discharge under § 727(a)(2)(A). *Id.* It noted that the definition of "transfer" is extremely broad and quoted the legislative history of that definition: "'any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control are interests in property. *A deposit in a bank account or similar account is a transfer.*'" *Id.* (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813). The court of appeals then commented, "[i]f, as the legislative history indicates, depositing money into a bank account is a transfer, then later withdrawing money from that account should be a transfer too—it ought to be a two-way street." *Id.*

But the court of appeals also concluded that it need not rely on the legislative history because, under California law, "'[a]s between the bank and the depositor such money becomes the property of the bank and the bank becomes the debtor of the depositor for the amount deposited.'" *Id.* (quoting *Chang v. Redding Bank of Com.*, 29 Cal. App. 4th 673, 681 (1994); additional citation omitted)). The court of appeals thus reasoned that the debtors did not own the money in their accounts but instead owned claims against the bank. *In re Bernard*, 96 F.3d at 1283. So, when they withdrew from their accounts, they exchanged debt for money, i.e., they parted with their property—specifically, their claims against the bank. *Id.*

In a case with facts similar to those presented here, the District Court for the Northern District of California, relying in part on *Bernard*, affirmed the bankruptcy court's denial of discharge under § 727(a)(2)(A). *Locke v. Schafer (In re Schafer)*, 294 B.R. 126 (N.D. Cal. 2003). In *Schafer*, the debtor defaulted on a line of credit, after which the creditor attached the debtor's bank account. *Id.* at 128. Shortly thereafter, the debtor opened a new bank account and deposited $75,000 into it. *Id.* The debtor testified that he opened the new account because the old one had been attached, and he used the funds he deposited into the new account to pay his creditors on a pro rata basis. *Id.* Based on these facts, the bankruptcy court concluded that the elements of § 727(a)(2)(A) had been met. *See id.* at 129. On appeal, the debtor argued that the deposit was not a transfer because the money placed into the new account was not concealed, and it remained

11

susceptible to attachment, meaning that assets available to creditors were not reduced. *Id.* at 130. Although the district court in *Schafer* focused primarily on the intent element, it rejected the latter argument, citing *Bernard*. It concluded that "deposits in bank accounts clearly qualify" as transfers and thus affirmed the bankruptcy court's ruling. *Id.* at 131-32.

Based on the foregoing authorities, we see no error in the bankruptcy court's finding that Debtor's deposit into the OCCU account qualified as a transfer under § 727(a)(2).

On appeal, Debtor argues that a deposit into a bank account cannot be a transfer under § 727(a)(2)(A). He relies on the "control test" developed in fraudulent transfer cases, including *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544 (9th Cir. 1991), and *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank (In re Consolidated Pioneer Mortgage Entities)*, 211 B.R. 704 (S.D. Cal. 1997), *aff'd in part, rev'd in part*, 166 F.3d 342 (9th Cir. 1999). He argues that, under the control test, his deposit into the OCCU account was not a transfer because OCCU never received a beneficial interest or obtained dominion over the funds and was instead a conduit for Debtor's checking transactions.

But the issues and the applicable law in *Bullion Reserve* and *Consolidated Mortgage Entities* are distinguishable. In both cases, the issue before the court was whether certain individuals were "transferees" under § 550(a) from whom fraudulent transfers could be recovered. The control test is used to determine who received the benefit of the transfer and is

12

thus liable for returning the transferred property to the estate. The purpose of § 550 is to restore the debtor's financial condition to the state it would have been had the transfer not occurred. *Decker v. Voisenat (In re Serrato)*, 214 B.R. 219, 232 (Bankr. N.D. Cal. 1997). Accordingly, the focus is not on the debtor's actions, but on the liability of the transferee.

In comparison, the salient question in the context of § 727(a)(2)(A) is whether a debtor placed property out of the reach of creditors to avoid paying them. This question focuses on the debtor's actions. The purpose of § 727(a)(2)(A) "is to prevent the discharge of a debtor who attempts to avert collection of his debts by concealing or otherwise disposing of assets." *In re Kessler*, 51 B.R. 895, 898 (Bankr. D. Kan. 1985) (citation omitted).

To that end, unlike the avoidance statutes, which are limited to transfers, § 727(a)(2) provides for denial of discharge when a debtor has disposed of property in **any** manner, i.e., by transferring, removing, destroying, mutilating or concealing property of the debtor or the estate, if that act was done with intent to hinder, delay, or defraud a creditor.[3] For

---

[3] The bankruptcy court and the parties focused narrowly on whether a deposit into a checking account constitutes a "transfer," and the bankruptcy court correctly applied binding Ninth Circuit authority (as it, and we, must) in finding that it does. But even if the deposit did not qualify as a transfer, the act of depositing funds into a new checking account for the purpose of hiding those funds from levying creditors could just as easily qualify as "removing" or "concealing" an asset. Although the levying creditors might have eventually discovered the OCCU account, there is no question that Debtor's act of opening that account and depositing a check or checks into it hid the funds from the judgment creditors and hindered their ability to collect, at least

this reason, we are not persuaded that the control test has any bearing on the § 727(a)(2)(A) analysis.

Finally, we think it is worthy of mention that §§ 727(a)(2)(A) and (a)(3) do not necessarily require the most nefarious of intents on the part of a debtor, nor do those sections require a showing of harm to creditors. Moreover, although § 727(a) identifies numerous culpable acts by debtors ("transferring" assets, "concealing" assets, etc.) and although there is an obvious overlap or relationship between some of these culpable acts (perhaps there is frequently an element of "concealment" within a "transfer"), it must also be acknowledged that, per the statute, a finding that a debtor committed any of these individual acts is sufficient to deny a discharge. These sections underscore the policy that a debtor should come into bankruptcy with his assets in the most coherent form possible and with all creditors treated equitably. Allowing a debtor to move assets around to keep them from some creditors flies in the face of that policy, and a debtor facing attachment or levy needs to be cognizant of the risk that he may lose his discharge as a result of exercising self-help if he later decides to file a chapter 7 bankruptcy petition.

## CONCLUSION

For these reasons, the bankruptcy court did not err in denying Debtor's discharge under §§ 727(a)(3) or (a)(2)(A). We therefore AFFIRM.

---

temporarily.